**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| JANE DOE (K.B.) | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | CIVIL ACTION FILE NO. |
| | § | 1:23-cv-02597-TWT |
| | § | |
| G6 HOSPITALITY, LLC, | § | |
| G6 HOSPITALITY FRANCHISING, | § | |
| LLC, | § | |
| G6 HOSPITALITY IP, LLC, | § | |
| G6 HOSPITALITY PROPERTY, LLC, | § | |
| G6 HOSPITALITY PURCHASING, | § | |
| LLC, | § | |
| MOTEL 6 OPERATING, LP, | § | |
| HARE KRISHNA SAVANNAH | § | |
| HOTEL, LLC | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

COMES NOW, Jane Doe K.B., Plaintiff in the above-styled and numbered cause, and files this First Amended Complaint complaining of G6 HOSPITALITY, LLC, G6 HOSPITALITY FRANCHISING, LLC, G6 HOSPITALITY IP, LLC, G6 HOSPITALITY PROPERTY, LLC, G6 HOSPITALITY PURCHASING, LLC, MOTEL 6 OPERATING, LP, AND HARE KRISHNA SAVANNAH HOTEL, LLC, as Defendants, and respectfully shows the Court as follows:

# I. SUMMARY OF CASE

1. Sex trafficking is a public health crisis that has hit epidemic proportions in our communities, resulting in a devastating effect on its survivors and a crushing financial effect on our world.

2. Estimates are that in 2016 there were as many as 40.3 million victims of human trafficking and sexual exploitation worldwide, including 4.8 million people trapped in sexual exploitation.[1]

3. The exploitation of victims of sex trafficking and prostitution most often does not occur solely at the hands of the traffickers and sex buyers. Rather, hotels often play an equal hand in the exploitation of these victims.

## A. THE ROLE OF THE HOTEL INDUSTRY AND DEFENDANT HOTELS

4. Defendants are aware of the important role that hotels play in the proliferation of sex trafficking and of the revenue they derive from sex trafficking that occurs at their hotels. Today, sex trafficking is pervasive in the United States, and hotels are the primary place where it happens.[2] For years, sex traffickers have "been

---

[1] INT'L LABOUR OFFICE, *Global estimates of modern slavery: Forced labour and forced marriage*, at 9, 38, https://www.ilo.org/wcmsp5/groups/public/---dgreports/---dcomm/documents/publication/wcms_575479.pdf.

[2] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-us- slavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking

able to reap these profits with little risk when attempting to operate within hotels."[3] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[4] Hotels have been found to account for over 90% of commercial exploitation of children.[5] The Hotel Industry and Defendants knowingly facilitate and benefit financially and otherwise from sex trafficking at their locations and the specific location complained of herein.

5. To address the crisis of sex trafficking at hotels, multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Georgia and Texas Attorney General, Love 146,

---

Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id.

[3] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; see also Eleanor Goldberg, You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic, Huffington Post, June 2016, at http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a- trafficking-victims-life_us_57714091e4b0f168323a1ed7

[4] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hotel Industry, Cornell Hotel Report, October 2015, at https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs Oct. 2015

[5] See Erika R. George and Scarlet R. Smith, In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[6]

6. Some of the policies and procedures recommended to the Hotel Industry and Defendants designed to reduce or eliminate sex trafficking on their premises include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[7]

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;
- Individuals show signs of physical abuse, restraint, and/or confinement;
- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;
- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;
- Individuals lack freedom of movement or are constantly monitored;

[6] https://www.dhs.gov/blue-campaign; United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking.Source:https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; https://www.missingkids.org/theissues/trafficking#riskfactors; https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; https://law.georgia.gov/key-issues/human-trafficking/human-trafficking-red-flags; https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf

[7] *See Id.*

- Individuals avoid eye contact and interaction with others;
- Individuals have no control over or possession of money or ID;
- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;
- Individuals have few or no personal items—such as no luggage or other bags;
- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;
- A group of girls appears to be traveling with an older female or male;
- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;
- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;
- Possession of bulk sexual paraphernalia such as condoms or lubricant;
- Possession or use of multiple cell phones; and
- Possession or use of large amounts of cash or pre-paid cards.

7. Other commonly recurring signs of sex trafficking at a hotel include use of cash or a prepaid card to pay for a room, refusal of housekeeping services for multiple days, requesting housekeeping services (such as new linens or sheets) but refusing hotel staff access to the room, frequent use of a "Do Not Disturb" sign, finding large amounts of cash or sex paraphernalia in a room, the smell of bodily

fluids or musk, the same person reserving multiple rooms, unusual traffic patterns to and from a room, individuals loitering in hallways or common areas who appear to be monitoring the area, evidence of illegal drugs or excessive alcohol use, excessive use of hotel computers for adult-oriented websites, cars in parking lots are parked so license plate is not visible, presence of multiple cellphones or computers, and an extended stay booked without significant personal possessions in the hotel.[8]

8. The signs of sex trafficking in a hotel environment follow well-established patterns and can readily be detected by appropriately trained staff.

9. Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[9] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

10. The United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[10] It is also well understood that "prostitution,"

---

[8] Department of Homeland Security, Blue Campaign Toolkit, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

[9] *Id.*

[10] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An*

"sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

11. The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[11]

12. All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

13. Jane Doe (K.B.) was trafficked at a hotel owned and operated by Defendants while exhibiting numerous signs and behaviors consistent with these recommendations in the presence of Defendants' employees and agents.

14. Defendants herein derived financial benefit from facilitating sex

*Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

[11] *Id.*

trafficking by providing venues where traffickers could exploit victims, including Jane Doe (K.B.) with minimal risk of detection or interruption.

15. Each Defendant developed a continuous business relationship with sex traffickers, including Jane Doe (K.B.)'s trafficker, by providing these traffickers with hotel rooms and related services despite apparent "red flags" that blatantly alerted Defendants to ongoing sex trafficking occurring at the Motel 6 Savannah. Defendants were, therefore, knowingly receiving a benefit from participation in a venture with traffickers that each Defendant knew or should have known was facilitating sex trafficking, including the sex trafficking of Jane Doe (K.B.).

16. G6 Hospitality also benefited from maintaining a commercial venture with its franchisee operating the Motel 6 Savannah. G6 Hospitality continued participating in this venture even though it knew or should have known that its franchisee was facilitating widespread trafficking at the hotel, ultimately resulting in the trafficking of Jane Doe (K.B.). G6 Hospitality was, therefore, knowingly receiving a benefit from participation in a venture with its franchisee that G6 Hospitality knew or should have known was facilitating sex trafficking.

**B. The Solution**

17. The Trafficking Victims Reauthorization Protection Act (TVPRA) has

provided civil remedies at the federal level since 2003 by "allow[ing] trafficking victims to sue their traffickers for money damages in federal court."[12]

18. In 2008, Congress amended the TVPRA to expand its scope through creation of "beneficiary" liability, providing sex-trafficking victims with a cause of action to sue defendants who—though not criminally liable under the TVPRA—benefited from "participation in a venture which that person knew or should have known" was engaged in criminal sex trafficking. [13]

19. The criminal justice system has been bearing the cross in the fight against the selling of sex and sex trafficking for far too long by prosecuting the traffickers, prostitution promoters, and sex buyers. It is now time for the civil justice system to hold those who profit from this sex trafficking and prostitution industry accountable for their wrongful conduct.

20. Congress created a civil cause of action in the TVPA "on the belief 'that the additional enforcement activity resulting from private civil actions [would be]

[12] Abigail K. Coker, Anaid Reyes Kipp, Torts, 38 Ga. St. U.L. Rev. 241, 242 (2021); ALEXANDRA F. LEVY, HUM. TRAFFICKING LEG. CTR., FEDERAL HUMAN TRAFFICKING CIVIL LITIGATION: 15 YEARS OF THE PRIVATE RIGHT OF ACTION 7 (Martina R. Vandenberg & Andrew B. Cherry eds., 2018) [hereinafter LEVY REPORT], https://www.htlegalcenter.org/wp-content/uploads/Federal-Human-Trafficking-Civil-Litigation-1.pdf [https://perma.cc/JX6U-34H2]

[13] *See* William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008. (PUBLIC LAW 110–457—DEC. 23, 2008).

worthwhile.'"[14]

21. For these reasons, and with great strength and courage, Jane Doe (K.B.) brings suit under the TVPRA.

## II. PARTIES

### A. PLAINTIFF

22. Plaintiff Jane Doe (K.B.) was at all relevant times a trafficked person as that term is defined in the TVPRA. Jane Doe (K.B.) is a resident of Harris County, Texas. Given the nature of these allegations, this complaint identifies Jane Doe (K.B.) as "Jane Doe (K.B.) or Jane Doe" throughout. She may be contacted through her lead counsel, whose information is contained below.

23. There is a collective and compelling interest in keeping Jane Doe (K.B.)'s identity anonymous.

### B. THE HOTEL DEFENDANTS

#### G6 HOSPITALITY LLC

24. G6 Hospitality LLC is a for-profit Delaware Corporation with its

[14] ALEXANDRA F. LEVY, HUM. TRAFFICKING LEG. CTR., FEDERAL HUMAN TRAFFICKING CIVIL LITIGATION: 15 YEARS OF THE PRIVATE RIGHT OF ACTION 7 (Martina R. Vandenberg & Andrew B. Cherry eds., 2018) [hereinafter LEVY REPORT], https://www.htlegalcenter.org/wp-content/uploads/Federal-Human-Trafficking-Civil-Litigation-1.pdf [https://perma.cc/JX6U-34H2], (quoting H.R. REP. 108-264, pt. 2, at 16 (2003))

principal place of business in Carrolton, Texas.

25. All references to G6 Hospitality LLC include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of G6 Hospitality LLC now or at any time relevant to the claims herein.

26. Defendant G6 Hospitality LLC has appeared and is before the Court.

**G6 HOSPITALITY FRANCHISING, LLC**

27. G6 Hospitality Franchising, LLC is a for-profit Delaware Corporation with its principal place of business in Carrolton, Texas.

28. All references to G6 Hospitality Franchising, LLC include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of G6 Hospitality Franchising, LLC now or at any time relevant to the claims herein.

29. Defendant G6 Hospitality Franchising, LLC has appeared and is before

the Court.

**G6 HOSPITALITY IP, LLC**

30. G6 Hospitality IP, LLC is a for-profit Delaware Corporation with its principal place of business in Carrolton, Texas.

31. All references to G6 Hospitality IP, LLC include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of G6 Hospitality IP, LLC now or at any time relevant to the claims herein.

32. Defendant G6 Hospitality IP, LLC has appeared and is before the Court.

**G6 HOSPITALITY PROPERTY, LLC**

33. G6 Hospitality Property, LLC is a for-profit Delaware Corporation with its principal place of business in Carrolton, Texas.

34. All references to G6 Hospitality Property, LLC include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or

corporation acting on behalf of G6 Hospitality Property, LLC now or at any time relevant to the claims herein.

35. Defendant G6 Hospitality Property, LLC has appeared and is before the Court.

**G6 HOSPITALITY PURCHASING, LLC**

36. G6 Hospitality Purchasing, LLC is a for-profit Delaware Corporation with its principal place of business in Carrolton, Texas.

37. All references to G6 Hospitality Purchasing, LLC include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of G6 Hospitality Purchasing, LLC now or at any time relevant to the claims herein.

38. Defendant G6 Hospitality Purchasing, LLC has appeared and is before the Court.

**MOTEL 6 OPERATING LP**

39. Motel 6 Operating LP is a for-profit Delaware Corporation with its principal place of business in Carrolton, Texas.

40. All references to Motel 6 Operating LP include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Motel 6 Operating LP now or at any time relevant to the claims herein.

41. Defendant Motel 6 Operating LP has appeared and is before the Court.

**HARE KRISHNA SAVANNAH HOTEL, LLC**

42. Hare Krishna Savannah Hotel, LLC is a for-profit Georgia limited liability company with its principal place of business in McDonough, Georgia.

43. All references to Hare Krishna Savannah Hotel, LLC include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Hare Krishna Savannah Hotel, LLC now or at any time relevant to the claims herein.

44. Defendant Hare Krishna Savannah Hotel, LLC has appeared and is before the Court.

## III. JURISDICTION AND VENUE

45. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000.00).

46. This is a civil action alleging, *inter alia*, violations of 18 U.S.C. § 1595.

47. Venue is proper in this district pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims asserted in this action, including Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

## IV. SEX TRAFFICKING UNDER FEDERAL LAW

48. Pursuant to 18 U.S.C. § 1591(a), all who knowingly provide or obtain commercial sex through force, fraud, and coercion – or performed by a minor under the age of 18 – are guilty of sex trafficking. This includes, at a minimum, both the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work and the 'johns' or 'buyers' who obtain, solicit, or patronize forced commercial sex work.[15] Criminal liability under 18 U.S.C. § 1591(a)(2) also

[15] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'johns,' 'tricks,' or 'buyers' [and such nomenclature is used herein], under federal law ***both*** categories are 'traffickers.'

extends to all who knowingly participate in a venture knowing or in reckless disregard of the fact that the venture is engaged in unlawful sex trafficking.

49. Under 18 U.S.C. § 1595(a), a victim of unlawful sex trafficking has a civil cause of action against (1) any "perpetrator" who engaged in a criminal violation of 18 U.S.C. § 1591; or (2) any "beneficiary" who knowing received a benefit from participation in a venture that the person knew or should have known was engaged in sex trafficking.

## V. STATEMENT OF FACTS

50. Jane Doe (K.B.) is a victim of sex trafficking within the meaning of 18 U.S.C. § 1595. Her sex trafficking was facilitated by a venture that all Defendants participated in when she was repeatedly trafficked at the Motel 6 Savannah over a 16-week period. Her trafficking occurred repeatedly at Defendants' hotel as a direct result of Defendants' acts and omissions that facilitated widespread sex trafficking at the Motel 6 Savannah.

51. Being one of four children separated from their parents and placed into adoption is traumatic. Being a young mother with two young children, not knowing how you will provide for them, is traumatic. The trauma from these experiences creates an environment for a vulnerable woman to be taken advantage of for

nefarious purposes. Against this backdrop, Jane Doe K.B. found herself a victim of human trafficking for the purposes of others' deviant sexual proclivities.

52. Under the constant threat of terror, Jane Doe K.B. was forced into human trafficking by Jason King (hereinafter, known as "King"), who forced Jane Doe K.B. to have sex with 'johns' for profit. King forced and kept Jane Doe K.B. in the bondage of human trafficking by physically assaulting her by choking her until she passed out, almost gouging her eye out, and beating her up to the extent that she had visible injuries. King prevented Jane Doe K.B. from escaping her nightmare by keeping her identification documents, not allowing her to keep any money, and prohibiting her from having contact with loved ones.

53. Between August 2016 and December 2016, Jane Doe K.B., along with other sex trafficking victims, was trafficked at the Motel 6 located at 201 Stephenson Ave., Savannah, GA 31405 (hereinafter, known as "Motel 6 Savannah"). For approximately sixteen (16) weeks, Jane Doe K.B. was sex trafficked at Motel 6 Savannah.

54. During the sixteen (16) weeks of terror and sexual assaults, Jane Doe K.B. was not allowed to go anywhere alone at Motel 6 Savannah, except to pay for the motel rooms. Jane Doe K.B. would purchase the motel rooms using her name

and paying in cash. Due to it being patently obvious to the Motel 6 Savannah staff that Jane Doe K.B. was being human trafficked for prostitution, the staff would provide her rooms at the back of the property where prostitution and drugs ran rampant.

55. It was well known around the city of Savannah, GA, that Motel 6 Savannah was notorious for prostitution and drug distribution and use. Pimps would hang out in the parking lot at all hours of the day/night, while drug dealers also sold narcotics on the property. Not only was this known to Motel 6 Savannah, but this all happened under the purview of the surveillance cameras throughout the property.

56. During the time that Jane Doe (K.B.) was trafficked at the Motel 6 Savannah the signs of widespread commercial sex at the hotel were open and obvious , but even further, it was obvious and known to staff at the Motel 6 Savannah that Jane Doe K.B. was being human trafficked for prostitution based on the following: Jane Doe K.B.'s attire; the high traffic of 'johns' in and out of her room; Jane Doe K.B. resided at the location for months with only a purse, a few clothing items, and without any luggage; housekeeping was not allowed inside of the room, and was met at the door to provide towels; an absurd amount of condoms found in the trash can; and Jane Doe K.B. looked nervous and afraid when interacting with

Motel 6 Savannah staff when purchasing the motel rooms, to name a few.

57. The rooms rented to Jane Doe K.B. had high foot traffic. When a new client entered the hotel room to sexually assault Jane Doe K.B., her trafficker would wait outside in the parking lot of Motel 6 Savannah. Between August 2016 and December 2016, Jane Doe K.B. saw no less than four (4) and up to ten (10) 'johns' daily. Jane Doe K.B. was sex trafficked seven days a week for approximately sixteen (16) weeks at Motel 6 Savannah.

58. At all relevant times, Hare Krishna Savannah Hotel, LLC (hereinafter referred to as "Franchisee") owned and operated the Motel 6 Savannah as a franchisee of the G6 Hospitality system.

59. At all material times, G6 Hospitality, LLC d/b/a Motel 6, G6 Hospitality Franchising LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, Motel 6 Operating, LP, (hereinafter collectively referred to as "G6 Hospitality") participated directly in the operation and management of the Motel 6 Savannah, including directly participating in renting rooms at this hotel. G6 Hospitality also exercised systematic control over Franchisee with respect to the operation of the Motel 6 Savannah, including but not limited to by controlling the aspects of hotel operations that directly contributed to K.B.'s

injury, such as setting and implementing policies on security, controlling training related to security issues, including trafficking, and setting and implementing policies and practices on detecting, disrupting, reporting, and responding to suspected sex trafficking.

60. G6 Hospitality had, at all relevant times, direct and systemic control over this facility, responsibility for its operations, and corporate knowledge of the events that occurred there. The Motel 6 Savannah is an alter ego, representative, and/or agent of G6 Hospitality. Defendants jointly exercise or have the right to exercise control over business operations, management, supervision, administration, and procedures at the Motel 6 Savannah.

61. G6 Hospitality and Franchisee jointly employ the employees of the Motel 6 Savannah because they jointly exercise a high degree of control over the terms and conditions of their employment. G6 Hospitality and Franchisee have a high degree of unified operations at Motel 6 Savannah where Jane Doe (K.B.) was trafficked for money. G6 Hospitality and Franchisee share the common policies and practices complained of throughout this Complaint. G6 Hospitality and Franchisee are separately and jointly responsible for compliance with all applicable laws and jointly and severally liable for any damages caused by employees of Motel 6

Savannah.

62. G6 Hospitality retains and exercises control over aspects of the operation of the Motel 6 Savannah directly relevant to Plaintiff's complaint, including but not limited to: a central online reservation system, revenue management tools, loyalty programs, the hotel website, policies and procedures regarding hotel security, policies and procedures regarding identification requirements and payment method requirements, policies and procedures regarding response to signs of human trafficking, training of hotel staff, and requirements for hotel staff to report suspicions of criminal activity.

## VI. ASSUMED OR COMMON NAME

63. Jane Doe (K.B.) brings this petition against each Defendant in their assumed or common name and expressly reserves the right under Georgia Rule of Civil Procedure 9-10-132 and 9-11-15 to substitute the true name of any Defendant if needed or in response to Court Order. Moreover, Jane Doe (K.B.) expressly invokes the right to amend under the doctrine of misnomer if any Defendants have been properly served but were done so under the wrong legal name.

## VII. FACTS REGARDING THE HOTEL DEFENDANTS

### A. The Use of G6Properties for Sex Trafficking is Prevalent

64. Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (K.B.) trafficking, that sex trafficking was ongoing and widespread at G6 properties including the Motel 6 Savannah.

65. Use of G6 properties for sex trafficking is well known to G6 Hospitality. Motel 6 hotels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.[16]

66. A Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that G6 Hospitality paid to settle a public nuisance lawsuit filed by the City of Los Angeles.[17] From this lawsuit, G6 Hospitality knew staff at its properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at G6 brand properties.

67. The settlement required G6 Hospitality to change policies that were facilitating sex trafficking.[18] Based on information and belief, G6 Hospitality has failed to adequately implement and enforce such changes.

---

[16] Sarah Meo and Louise Shelley, *Sex Trafficking and Hotels: Why there is a Need for Effective Corporate Social Responsibility* (Nov. 11, 2021), https://www.globalpolicyjournal.com/blog/11/11/2021/sex-trafficking-and-hotels-why-there-need-effective-corporate-social-responsibility.

[17] *Motel 6 pays $250,000 to settle human trafficking suit* (Aug. 31, 2017), https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/.

[18] *Id.*

68. G6 Hospitality intentionally ensures its hotels are "strategically located . . . close to airports, freeways, and other thoroughfares" making them attractive venues for trafficking and compelled prostitution.[19]

69. Public statements of G6 Hospitality confirm that they knew that sex trafficking is a problem in the hotel industry and that they retained control over the response of their hotels to this problem. G6 Hospitality recognizes that "[t]raffickers often use hotels and motels for sex trafficking activities due to the privacy extended to guests."[20] They also acknowledged the significant role they have in the three D's: deterring, detecting, and disrupting sex trafficking in their hotels.[21]

70. Unfortunately for Jane Doe (K.B.) the promises made by Defendants have proven empty. Defendants have made the decision not to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (K.B.).

---

[19] *Motel 6 – An Iconic American Brand*, https://g6hospitality.com/our-brands/#about-motel-six (last visited Aug. 10, 2023).

[20] *G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING*, http://g6propertycollateral.com/wp-content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf

[21] *Id.*

71. Upon information and belief, each of the Defendants monitored criminal activity occurring at G6 hotels and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those hotels, including the specific hotel where K.B. was trafficked.

72. Countless tales of tragedy establish the entrenched, pervasive nature and knowledge of Motel 6's role as the venue for sex trafficking across the Unites States for years:

- In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten times per day.[22]
- In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[23]
- In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[24]
- From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[25]

---

[22] Amy Fine Collins, *Sex Trafficking of Americans: The Girls Next Door*, Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105.

[23] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.

[24] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html

[25] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download.

- Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[26]

- The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[27]

- The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California.[28]

- In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[29]

- Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[30]

- In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women.[31]

---

[26] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims.

[27] *FBI Investigates Human Trafficking At Madison Hotel*, WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.

[28] *Suspects Busted in Anaheim Sex Ring*, ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784.

[29] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex- traffickers-inhumanity/.

[30] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.

[31] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.

- Police investigated a sex trafficker in March 2014 and ultimately charged him for his crimes including, but not limited to, selling a seventeen (17) year old girl for sex out of a Motel 6 in Roseville, Minnesota.[32]

- In May 2014, two (2) traffickers were arrested at a Motel 6 in Monterey, California after a twenty-one (21) year old woman escaped from their captivity.[33]

- In the summer of 2014, two (2) girls ages fifteen (15) and sixteen (16) were taken from a children's shelter by a sex trafficker and trafficked out of a Motel 6 in Cutler Bay, Florida.[34]

- A Las Vegas man was charged with sex trafficking two (2) victims, including a seventeen (17) year old girl, in January 2015, out of a Motel 6 in Rapid City, Nevada.[35]

- In February 2015, two (2) men were arrested for sex trafficking a fourteen (14) year old girl at a Motel 6 in Seekonk, Rhode Island.[36]

- A local law enforcement investigation resulted in the rescue of a fifteen (15) year old runaway in February 2015, from a Motel 6 near the Oakland,

---

[32] Man, 25, Is Accused Of Trafficking Teens, Twin Cities Pioneer Press (Jun. 5, 2014), https://www.twincities.com/2014/06/05/man-25-is-accused-of-trafficking-teens-2/

[33] Felix Cortez and Amy Larson, Monterey Police: 2 Human Sex Traffickers Arrested After Victim Escapes Motel,KSBW8 (May 9, 2014), https://ksbw.com/article/monterey-police-2-human-sex-traffickers-arrested-after-victim-escapes-motel/1054172.

[34] David Goodhue, Next Stop For Man Accused Of Sex Trafficking 2 Teens: Federal Court, Miami Herald (Sept. 2, 2015), https://www.miamiherald.com/news/local/news-columns-blogs/deadline-miami/article33360843.html.

[35] Las Vegas Man Charged With Human Trafficking In Rapid City, Argus Leader (Jan. 17, 2015), https://www.argusleader.com/story/news/crime/2015/01/17/las-vegas-man-charged-human-trafficking-rapid-22city/21922915/.

[36] Stephen Peterson, RI Man Gets Jail In Sex-Trafficking Case Involving Seekonk Motel (Oct. 28, 2016), http://www.thesunchronicle.com/news/local_news/ri-man-gets-jail-in-sex-trafficking-case-involving-seekonk/article_d7a25494-9d21-11e6-8f94-63e5c74facb3.html.

California airport where she was being sex trafficked.[37]

- In North Charleston, South Carolina, a seventeen (17) year old girl was rescued in March 2015 from a Motel 6 by special agents from the United States Department of Homeland Security. The girl was sold for sex, beaten, and starved by a sex trafficker.[38]

- Two men were arrested in March 2015 for sex trafficking a fifteen (15) year old girl at Motel 6 in Austin, Texas.[39]

- In March 2015, police arrested a man for sex trafficking a runaway seventeen (17) year old at a Motel 6 in Warwick, Rhode Island.[40]

- Over a fourteen (14) month period ending in approximately April 2015, at the same Motel 6 in Warwick, Rhode Island had seventy-five (75) arrests on its property for crimes including sex-trafficking.[41]

- Seven (7) people were indicted in January 2016, by a Colorado grand jury for sex trafficking children from 2014 through the summer of 2015, out of hotels in Denver, Colorado, including a Denver area Motel 6.[42]

- In the summer of 2015, a woman was arrested at a Motel 6 in Great Falls,

---

[37] Emilie Raguso, Woman Charged In Berkeley Teen Sex Trafficking Case (Dec. 8, 2015), https://www.berkeleyside.com/2015/12/08/woman-charged-in-berkeley-teen-sex-trafficking-case.

[38] Melissa Boughton, Police Say Teen Starved, Beaten at North Charleston Hotel; Man Arrested in Sex-Trafficking Case (Mar.2, 2015), https://www.poastandcourier.com/archives/police-say-teen-starved-beaten-at-north-charleston-motel-man/article_032153eefcb6-5333-9182-926a7f43dfbf.html.

[39] Lindsay Bramson, Local Teen Saved from Sex Slavery; Two Charged, KXAN Austin (Mar. 6, 2015), https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764.

[40] Amanda Milkovits, Massachusetts Man Accused Of Trafficking Teen In Warwick Motel, NewportRI.com (Mar. 24, 2015), https://www.newportri.com/article/20150324/NEWS/150329666.

[41] Sarah Kaplan, Crime-Ridden Motel 6 In R.I. Will Hand Over Guest List To Police, The Washington Post (Apr. 28, 2015), https://www.washingpost.com/news/morning-mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-hand-over-guest-list-to-police/?utm_term=.a804ce3f32a8.

[42] Hsing Tseng, Seven Indicted By Colorado Grand Jury In Child Sex Trafficking Ring Bust, Fox 31 Denver (Jan. 6, 2016), https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex- trafficking-ring-bust/.

Montana where she was involved in sex trafficking a seventeen (17) year old girl.[43]

- A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[44]

- In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[45]

- In approximately July 2015, sex traffickers sold a fifteen (15) year old girl for sex at a Motel 6 in Pismo Beach, California.[46]

- In November 2015 a man was arrested at a Motel 6 in Ventura, California and was criminally charged with sex trafficking a fifteen (15) year old girl who was found with him.[47]

- In January 2016, a man who operated a criminal venture out of a Motel 6 in Frederick City, Maryland was charged with sex trafficking.[48]

- Criminal charges were brought against a man who sex trafficked a fifteen

[43] Andrea Fisher, Woman Caught Up In Human Trafficking Ring Pleads Guilty (Aug. 29, 2016), https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleads-guilty/89566374/.
[44] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, HeraldNet (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.
[45] Tuscaloosa Man Charged With Rape And Trafficking Mississippi Teen, NewsMississippi (Nov. 7, 28 2014), https://newsms.fm/tuscaloosa-man-charged-human-trafficking-mississippi-teen/.
[46] Matt Fountain, Four Accused Of Pimping Out 15-Year-Old Girl In SLO Will Stand Trial, SanLuisObispo.com (May 5, 2016), https://www.sanluisobispo.com/news/local/article75832962.html.
[47] Fresno Man Sentenced To Prison For Pimping, Human Trafficking In Ventura County, Ventura County Star (Apr. 26, 2016), https://www.vcstar.com/story/news/local/communities/ventura/2016/04/26/fresno-man-sentenced-to-prison-for-pimping-human-trafficking-in-ventura-county/88714698/.
[48] Frederick Police Arrest Man On Human Trafficking Charges, CBS13 Baltimore (Jan. 16, 2016), https://baltimore.cbslocal.com/2016/01/16/frederick-police-arrest-man-on-human-trafficking-charges/.

(15) year old girl out of a Motel 6 in Beaumont, Texas in March 2016.[49]

- On March 23, 2016, a victim of a sex trafficking ring died at a Motel 6 in Winchester, West Virginia.[50]

- The leader of a sophisticated and organized sex trafficking ring beat and raped one of his victims in April 2016, at a Motel 6 in Tinicum Township, Pennsylvania.[51]

- A federal court sentenced a man to ten (10) years in prison in November 2016, for sex trafficking a fifteen (15) year old girl in 2014 out of a Motel 6 in Hartford County, Connecticut.[52]

- Local law enforcement rescued a seventeen (17) year old runaway in December 2016, who was being sex trafficked from a Motel 6 in Gibbstown, New Jersey.[53]

- In February 2017, the leader of a child sex trafficking ring in Tulsa, Oklahoma, was busted at a local Motel 6 where federal authorities rescued a sixteen (16) year old survivor of sex trafficking.

- A forty-five (45) year old man was charged with human trafficking after picking up a teenage boy from school and taking him to a Motel 6 in Cedar

[49] Quentin Hope, Women Accuse Defendant Of Sex Trafficking, Threatening To Kill Them, KFDM.com (Sept. 11, 2018), https://kfdm.com/news/local/women-accuse-defendant-of.
[50] Ellie Williams, Martinsburg Man Convicted On Sex Trafficking And Drug Charges, LocalDVM.com (Jan. 17, 2019), https://www.localdvm.com/news/virginia/martinsburg-man-convicted-on-sex- trafficking-drug- charges/1708490814.
[51] Justin Heinze, Man Behind Human Trafficking Ring In Chester County Sentenced, Patch (Sept. 26, 2017), https://patch.com/pennsylvania/phoenixville/man-behind-human-trafficking-ring-chester-county-sentenced.
[52] David Owens, Hartford Man Sentenced To Prison For Sex Trafficking Of 15-Year-Old Girl, Hartford Courant (Nov. 14, 2016), https://www.courant.com/news/connecticut/hc-sex-trafficking-teenager-prison-1115-20161114-story.html.
[53] Matt Gray, Three Indicted On Charges Of Forcing Teen Into Prostitution, NJ.com (Sept. 24, 2017),21 https://www.nj.com/gloucester-county/index.ssf/2017/09/post_139.html.

Park, Texas in approximately March 2017.[54]

- At a Motel 6 in Des Moines, Iowa a man sex trafficked a minor victim in June 2017.[55]

- In approximately June 2017, a seventeen (17) year old runaway was rescued by law enforcement from a Motel 6 in Las Vegas, Nevada out of which a sex trafficker was operating.[56]

- A seventeen (17) year old girl was sold for sex by traffickers at a Motel 6 in Portland, Oregon in June 2017.[57]

- In August 2017, two (2) men operated out of a Motel 6 in Springfield, Virginia to sex traffic a sixteen (16) year old girl.[58]

- Two (2) men were arrested in December 2017, for sex trafficking a minor female out of a Motel 6 in Destin, Florida.

- In February 2018, a man engaged in sex trafficking of two (2) women at a Motel 6 near New Orleans, Louisiana.[59]

---

[54] Little Elm Man Accused of Trafficking Austin Teen, KHOU11.com (Sept. 19, 2017), https://www.khou.com/article/news/local/texas/little-elm-man-accused-of-trafficking-austin-teen/285-476893013.

[55] Luke Nozicka, Seven Des Moines Residents Charged With Sex Trafficking, Feds Say, The Des MoinesRegister (Jun. 11, 2018), https://www.desmoinesregister.com/story/news/crime-and-courts/2018/06/11/7-des-moines-residents-charged-sex-trafficking-feds-des-moines-sexual-prostitution-iowa-texas/692264002/.

[56] Rachel Crosby, Woman Accused of Sex Trafficking Runaway on Las Vegas Strip, Las Vegas Review-Journal (Jun. 2, 2017), https://www.reviewjournal.com/crime/sex-crimes/woman-accused-of-sex-trafficking-runaway-on-las-vegas-strip/.

[57] Nick Morgan, Accused Human Traffickers Stopped In Medford, Mail Tribune (Jul. 7, 2017), http://mailtribune.com/news/crime-courts-emergencies/accused-human-traffickers-stopped-in-medford.

[58] Emily Leayman, 16-Year-Old Forced To Be Prostitute At Springfield Motel: Report, Patch (Feb. 6, 2018), https://patch.com/virginia/burke/16-year-old-forced-be-prostitute-springfield-motel-report.

[59] Emily Lane, Man Accused of Trafficking Took Females to New Orleans To 'Make Some Money for Mardi Gras', Nola.com (Oct. 18, 2018), https://www.nola.com/crime/2018/10/man-accused-of-trafficking-took-females-to-new-orleans-to-make-some-money-for-mardi-gras-warrant.html.

- The Columbus City Attorney's Office issued ultimatums in February 2018, to several area hotels to clean up or shut down, including but not limited to, the Motel 6 at 7480 North High Street which, according to police, had been the site of significant criminal activity and is nearby the Motel 6 Columbus.[60]

- Law enforcement responded to a 911 call from a seventeen (17) year old girl who was calling from the lobby of a Motel 6 in Claremont, California in February 2018. Upon arrival, officers discovered that the seventeen (17) year old caller and a fifteen (15) year old girl were both being sex trafficked at the hotel.[61]

- In March 2018, police found a ten (10) year old girl wearing a dog collar with a twenty-three (23) year old man who had raped her at a Motel 6 in Lakeland, Florida.[62]

- In Richfield, Minnesota a man was criminally charged in June 2018, for sex trafficking a fifteen (15) year old girl out of an area Motel 6.[63]

- Police busted a human trafficking operation at a Motel 6 in Ann-Arbor, Michigan in July 2018.[64]

- A Motel 6 in Braintree, Massachusetts surrendered its operating license in

[60] Maureen Kocot, Columbus Cracks Down On Businesses With High Crime Rates, 10 WBNS (Feb. 7, 2018), https://www.10tv.com/article/columbus-cracks-down-businesses-high-crime-rates.

[61] Serena Fangary, Social Media, Sexual Assault, And Sex Trafficking, Webb Canyon Chronicle (May 21 23, 2018), https://webbcanyonchronicle.com/2953/features/social-media-sexual-assault/.

[62] David Neal, Florida Man, Burger King Manager Met His Online Girlfriend For A Hotel Sex Date, Cops Say She's 10., Miami Herald (Mar. 29, 2018), https://www.miamiherald.com/news/local/community/miami-dade/west-miami-dade/article207303799.html.

[63] Man Charged With Sex Trafficking, Prostitution Of 15-Year-Old At Richfield Motel, 5 ABC Eyewitness News (Jun. 19, 2018), https://kstp.com/news/man-charged-sex-trafficking-richfield- hotel/4955796/.

[64] Darcie Moran, Man Charged With Human Trafficking At Ann Arbor-Area Hotel, MLive.com (Dec. 7, 2018), https://www.mlive.com/news/ann-arbor/2018/12/man-charged-with-human-trafficking-at-ann-arbor-area-hotel.html.

September 2018, after significant criminal activity, including sex trafficking, was documented occurring on its property.[65]

73. Ultimately, several hundred of traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of G6 properties.

74. Motel 6 advertises so-called partnerships with anti-trafficking organizations, but internal communications indicate the partnership is more for advertising purposes than actual anti-trafficking efforts. This partnership reflects Defendants' knowledge of the pervasiveness of human trafficking at G6 hotels but has not resulted in reasonable actions in response to that knowledge.

75. Similarly, G6 Hospitality knew sex trafficking was occurring at its hotels through publicly available online review websites, which are regularly reviewed by companies such as G6 Hospitality:

- 2010 TripAdvisor review out of Maine states "[M]y tour group and I figured that we should just stay here considering we were only staying here one night...There was dirtbags hanging around the pool area, and in the little yard area on the side. It looked as if all of the people who LIVED THERE were on drugs by the way they talked! Also during my stay there we saw a prostitute who must have been living there! She looked anorexic and came into the lobby telling the receptions that the cops might be coming so tell her if they show up! (i am not making any of this up) there was also "a security guard" there waiting in the lobby

[65] Daniel Libon, Motel 6 Ends Fight To Reopen Braintree Location, Patch (Sept. 19, 2018), https://patch.com/massachusetts/braintree/motel-6-ends-fight-reopen-braintree-location.

all day and throughout the night making sure that the prostitute did not leave. They told the receptionist that the prostitute had 2 clients upstairs..."[66]

- 2011 Yelp review in California states "…We paid to spend two night, but after one night of being terrorized by pimps, prostitutes, "druggies" and homeless sleeping in cars we checked out…Our lasting memory should be the beautiful wedding, but instead it will be know as our night of terror. The management is well aware of this and contribute to the problem by renting rooms to these terrorist..."[67]

- 2011 TripAdvisor review from California states "…After watching the pedestrian and vehicle traffic for a period of time in the immediate area, it is apparent that the staff does not decline service to prostitutes w/ their protection (pimps) and drug dealers...While the affordable rates are the draw, once your there, you'll realize that Corporate hasn't paid attention to what occurs there or doesn't care as long as the money keeps coming in."[68]

- 2011 Yelp review from California states "Sheets and towels are frequently stained. Prostitution is a problem at this location, leading me to believe management and the staff (who are very friendly with the hookers) turns a blind eye to it to fill rooms or is being paid to look the other way…"[69]
   a.

- 2012 TripAdvisor review from Colorado states "…The first night, I received phone call after phone call, asking if I wanted "sexual favors" done to me. NO!!!!!! I also witnessed numerous drug dealings going

[66] https://www.tripadvisor.com/Hotel_Review-g41519-d244102-Reviews-Motel_6_Boston_North_Danvers-Danvers_Massachusetts.html
[67] https://www.yelp.com/biz/motel-6-santa-rosa-south-santa-rosa
[68] https://www.tripadvisor.com/Hotel_Review-g32810-d78752-Reviews-Motel_6_Oakland_Airport-Oakland_California.html
[69] https://www.yelp.com/biz/motel-6-salinas

on, and had my door banged on several times…Upon checkout, I explained issues to the clerk (the same person who checked me in) and she said, oh well…"[70]

- 2012 Yelp review out of Texas states "Do not stay here. Just stayed here and had some shadey stuff goin on…for one the hotel is a front for a prostitution ring the owners are running…I turned down one of the girls who in which called my room phone and asked if I wanted company and soon after had one with purple hair and what looked like her pimp at my door. I didn't answer I just watched through the peep hole. after they knocked for about 5 mins they left. As soon as I got comfortable I hear someone messing with my door and I look through the peep hole and they are back and are trying to use a key.. woooow..."[71]

- 2012 Yelp review from California states "what to say about the "no tell motel sex" lol sad but true...my neighboor had people as in men in and out all night long if you get my drift, and when i called the front desk they said they would check it out and never did…"[72]

- 2012 TripAdvisor review out of Illinois states "I have recently been relocated with my job out here so looking for a place in glenview area. I stood here for a week. They had pimps and prostitution going on next door, under and across from me my whole week hear. I told front desk of the noise and loud banging they were making all day and night long. The front desk called one room where they were in the prostitute got rude with her you can hear it they were told to check out but the same day they checked back in next door to me. Staff here must be in on it some how cause I watched a pimp and a few under age girls go in and out a few rooms across and next to me all night long with custermers. The following morning around 5am I was woken to a girl in the hall yelling at the pimp who just hit her. It gets better I guess staff told them

[70] https://www.tripadvisor.com/Hotel_Review-g33388-d83061-Reviews-Motel_6_Denver_Central_Federal_Boulevard-Denver_Colorado.html
[71] https://www.yelp.com/biz/motel-6-dallas-4
[72] https://www.yelp.com/biz/motel-6-escondido?start=60

I made a complaint so then after they were banging on my door and getting rooms next to me as well making extreme noise so they can get me out..."[73]

- 2013 TripAdvisor review from New York states "If you like drugs and drug addicts and drug dealing and prostitutes, this is the place to go. Not only do these people live in the hotel and use it as a place of business, but some of the staff is involved in drug dealing as well…"[74]

76. This sampling of news stories and reviews establishes that G6 Hospitality knew (or at a minimum, certainly should have known):

a. There was widespread and ongoing sex trafficking occurring at G6 properties.

b. Sex trafficking was a brand-wide problem for G6 originating from management level decisions at the G6 corporate offices.

c. G6 Franchisee and hotel staff were not taking reasonable steps to detect, deter, and disrupt known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the hotel properties.

d. G6's efforts, if any, to stop facilitating sex trafficking in their properties were not effective.

---

[73] https://www.tripadvisor.com/Hotel_Review-g36052-d243950-Reviews-Motel_6_Chicago_North_Glenview-Glenview_Illinois.html

[74] https://www.tripadvisor.co.nz/Hotel_Review-g29810-d93070-r172297063-Motel_6_Amherst_NY_Buffalo-Amherst_New_York.html

e. G6 and its Franchisee were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

77. Despite the mounting evidence that sex trafficking at G6 properties was ongoing and growing, G6 Hospitality chose to continue earning revenue from sex trafficking in their branded hotels.

## B. The Use of Motel 6 Savannah for Sex Trafficking Was Well Known

78. It was well known around the city of Savannah, GA, that Motel 6 Savannah was notorious for prostitution and drug distribution and use, and G6 Hospitality was aware or should have been aware of the same.

79. Online reviews specific to the Motel 6 Savannah establish the nature of Motel 6 Savannah's role as the venue for sex trafficking and Defendants' knowledge of the same:

- In September 2022, a Trip Advisor review stated, "People wandering parking area all night. NO receipt for cash payment."[75]
- In January 2020, a Trip Advisor review stated, "This motel is a prostitute, drug infested place. The people staying in [the] room next to me were in and out all night long selling dope."[76]

---

[75] https://www.tripadvisor.com/Hotel_Review-g60814-d86771-Reviews-Motel_6_Savannah_Midtown-Savannah_Georgia.html

[76] https://www.tripadvisor.com/Hotel_Review-g60814-d86771-Reviews-Motel_6_Savannah_Midtown-Savannah_Georgia.html

- In August 2020, an Expedia review stated, "Horrible the place was filthy!! There were drugs being sold and prostitution on the property. I left within 15 minutes."[77]

- In September 2019, a Trip Advisor review stated, "They do drug deals in the open, smoke weed in front of the kids. And party outside in front of their rooms. The motel does try to keep them in the back, and on second floor. The issue seems to be the drug dealers and prostitutes that come to service them. When I was there in late August, the prostitutes had set up a makeshift cardboard and shopping cart room in the parking lot, just 50 feet from the pool, but just off motel 6 property. Walking the dog I stumbled across a Hooker and her client leaving this love shack. Ten days later it was disassembled, but all the cardboard and carts were still there. I did see condoms and wrappers in the dog walk area. Dealers that pull in, park across 3 spots and right under the security camera to do their deals. There is no way the Indian owners are not aware of this activity. They choose to profit from it."[78]

- In June 2015, an Expedia review stated, "Drug addicts and prostitutes. It was like a scene out of a movie. Drug addicts outside in the parking lot hanging out of cars. Prostitutes outside walking around. This hotel should not even be advertised on Expedia. Disgusting."[79]

- In March 2015, an Expedia review stated, "Hookers in and out parking lot. One girl got beat up [and] thrown out [a] window. Police was out there."[80]

- In May 2015, an Expedia review stated, "Not sure what was worse! The condom left in the toilet, the blood stains on the mattress, or the hookers hanging outside waiting for their next customer. I can't believe

[77]https://www.expedia.com/Savannah-Hotels-Motel-6-Savannah.h25632.Hotel-Information?pwaDialog=reviews-property-reviews-1

[78] https://www.tripadvisor.com/Hotel_Review-g60814-d86771-Reviews-Motel_6_Savannah_Midtown-Savannah_Georgia.html#REVIEWS

[79]https://www.expedia.com/Savannah-Hotels-Motel-6-Savannah.h25632.Hotel-Information?pwaDialog=reviews-property-reviews-1

[80]https://www.expedia.com/Savannah-Hotels-Motel-6-Savannah.h25632.Hotel-Information?pwaDialog=reviews-property-reviews-1

hotels.com would even have this place listed. Only good thing is you can bring your dogs without having to pay a pet deposit. Now I know why, the dogs are much better than the hookers."[81]

- In January 2015, a Trip Advisor review stated, "Stayed here and at night I had people trying to break into my room. As a single lady traveller, I have never been so scared. They have pimps and hookers doing there business in the rooms."[82]

- In January 2021, an Expedia review stated, "Not safe—drug deals going on in parking lot. People coming and going at all hours."[83]

- In July 2022, a Trip Advisor review stated, "There was a huge fight in the pool area, and someone came shooting through the parking lot in a car. Lots of men outside drinking in the parking lot and by the front doors of the rooms all hours of the night. There were used needles all over the ground. Lots of fighting and arguing amongst guest…Cops came out at least 5 times and I only stayed my partial stay because of how dangerous this place really is."[84]

- In March 2020, a Trip Advisor review stated, "6 cop cars, 2 supervisor SUVs, detective in car investigating…something…front desk said guest below us was ill. Was told this 2x during the 4 hour police investigation of this poor sick person. No ambulance came, by the way."[85]

- In March 2015, an Expedia review stated, "Do not stay here…The man booked in the room next to me was telling me that the AC was not

[81] https://www.expedia.com/Savannah-Hotels-Motel-6-Savannah.h25632.Hotel-Information?pwaDialog=reviews-property-reviews-1

[82] https://www.tripadvisor.com/Hotel_Review-g60814-d86771-Reviews-or30-Motel_6_Savannah_Midtown-Savannah_Georgia.html#REVIEWS

[83] https://www.expedia.com/Savannah-Hotels-Motel-6-Savannah.h25632.Hotel-Information?pwaDialog=reviews-property-reviews-1

[84] https://www.tripadvisor.com/Hotel_Review-g60814-d86771-Reviews-Motel_6_Savannah_Midtown-Savannah_Georgia.html#REVIEWS

[85] https://www.tripadvisor.com/Hotel_Review-g60814-d86771-Reviews-Motel_6_Savannah_Midtown-Savannah_Georgia.html#REVIEWS

working while he stood there with the door to his room open and I could see his collection of 'crack rocks' displayed across the table. This motel is a haven for drunks and druggies. Protect yourself and stay away!"[86]

- In August 2020, an Expedia review stated, "Stayed in other Motel 6 and this location was by far the worst…Entry door looked as if at some point got kicked in and bent, feeling of being at a unsafe place begun right at that moment…Entire night all kinds of weird people hanging outside and smoking. Guarantee no one will feel safe at this property. Ashamed to make my wife go through this experience."[87]

- In March 2015, an Expedia review stated, "It seems to me this is being used as a housing facility for either homeless or drug rehab. One tenant, as we left, asked us to stay with er as shew was afraid because a strange man went to chase her when she left her room."[88]

- In June 2022, a Yelp review stated, "No change of towels nor room cleaning during my entire 7 nights stay."[89]

- In October 2019, an Expedia review stated, "It was so bad, had a bad smell when you walked in. There was people outside the room next to us. Not sure what was going on, but they were in and out."[90]

- In September 2019, an Expedia review stated, "There were drug deals happening during the week at night with loud profanity…"[91]

---

[86]https://www.expedia.com/Savannah-Hotels-Motel-6-Savannah.h25632.Hotel-Information?pwaDialog=reviews-property-reviews-1
[87]https://www.expedia.com/Savannah-Hotels-Motel-6-Savannah.h25632.Hotel-Information?pwaDialog=reviews-property-reviews-1
[88]https://www.expedia.com/Savannah-Hotels-Motel-6-Savannah.h25632.Hotel-Information?pwaDialog=reviews-property-reviews-1
[89] https://www.yelp.com/biz/motel-6-savannah-2?sort_by=rating_asc
[90]https://www.expedia.com/Savannah-Hotels-Motel-6-Savannah.h25632.Hotel-Information?pwaDialog=reviews-property-reviews-1
[91]https://www.expedia.com/Savannah-Hotels-Motel-6-Savannah.h25632.Hotel-Information?pwaDialog=reviews-property-reviews-1

- In September 2019, an Expedia review stated, "A lot of addicts waking all times of night."[92]
- In August 2019, an Expedia review stated, "The hotel got raided by cops all 3 days…Surrounded by drug users and sellers."[93]
- In July 2019, an Expedia review stated, "This hotel had a lot of foot traffic at odd hours of the night…Not a family friendly environment."[94]
- In August 2016, an Expedia review stated, "Many rather shady characters milling about the parking lot. I would not let my wife and children alone outside even to walk to the car 10 feet away."[95]

80. Upon information and belief, traffickers, including Jane Doe (K.B.)'s trafficker, repeatedly, and in the past had routinely, chose to use the Motel 6 Savannah for their sex trafficking activity. As such, Defendants also knew or should have known about the pervasive sex trafficking at the Motel 6 Savannah based on obvious indicators of this activity.

81. By continuing to allow the population of traffickers to operate at the Motel 6 Savannah, despite their actual or constructive knowledge of this trafficking, Defendants entered into a continuous business relationship with the population of

[92]https://www.expedia.com/Savannah-Hotels-Motel-6-Savannah.h25632.Hotel-Information?pwaDialog=reviews-property-reviews-1
[93]https://www.expedia.com/Savannah-Hotels-Motel-6-Savannah.h25632.Hotel-Information?pwaDialog=reviews-property-reviews-1
[94]https://www.expedia.com/Savannah-Hotels-Motel-6-Savannah.h25632.Hotel-Information?pwaDialog=reviews-property-reviews-1
[95] https://www.expedia.com/Savannah-Hotels-Motel-6-Savannah.h25632.Hotel-Information?pwaDialog=reviews-property-reviews-1

traffickers, which included but was not limited to Jane Doe (K.B.)'s trafficker.

82. Jane Doe (K.B.)'s trafficker chose to bring her to and keep her at a G6 Hospitality hotel because of G6 Hospitality's policies and practices that created a favorable venue for sex trafficking.

83. Upon information and belief and based on hotel reviews, guest reviews and comments, and records of law-enforcement calls, there were multiple trafficking victims trafficked at the Motel 6 Savannah prior to Jane Doe (K.B.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above.

84. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

85. All knowledge from the staff at the Motel 6 Savannah is imputed to Franchisee. Franchisee knew about this widespread and ongoing trafficking at the Motel 6 Savannah, including the trafficking of Jane Doe (K.B.), through the direct observations of hotel staff, including management-level staff. Based on this knowledge, Franchisee, its management, and its staff had a duty to report these signs to G6 Hospitality as specific to Jane Doe (K.B.) and as to prior sex trafficking at the Motel 6 Savannah. Based upon information and belief, the traffickers of Jane Doe (K.B.) and other sex traffickers frequently had in the past routinely used the Motel 6 Savannah for sex trafficking with approval, acquiescence, and/or implicit support of G6 Hospitality and Franchisee.

**C. Motel 6 Facilitated the Trafficking of Jane Doe (K.B.)**

86. During Jane Doe (K.B.)'s trafficking in 2016, she was forced by her trafficker to pay for rooms in her name using cash at Motel 6 Savannah. Over this period, there were many obvious and apparent signs that Jane Doe was the victim of human trafficking. Despite this, Motel 6 Savannah staff continued providing a venue for Jane Doe's sexual exploitation.

87. The criminal activity was so rampant and acceptable that drug dealers and pimps hung out in the parking lot and outside the doors of the rooms as they

conducted their illicit activity. The conduct of the pimps and drug dealers was so obvious and blatant that they would hang out in the breezeways of the property in plain view of the staff and security cameras. Instead of prohibiting this type of activity on their property, Motel 6 Savannah promoted such activity by providing rooms at the back of the property, which was out of site from the street. This was a specific decision made by the staff at Motel 6 Savannah to assist and support activity they knew or should have known was illegal sex trafficking.

88. While housekeeping would clean from time to time, housekeeping customarily provided towels at the doorway without entering the rooms.

89. Jane Doe (K.B.) stated this went on between August and December of 2016. Jane Doe (K.B.) is certain of this time frame, because she released balloons in memory of her mother's birthday on December 11th near the construction that was going on at Motel 6 Savanah. Jane Doe (K.B.) met 4 to 10 buyers each day and was repeatedly sexually assaulted at the Motel 6 Savannah.

90. During her trafficking, Jane Doe's trafficker frequently and regularly used the Motel 6 Savannah location because he knew that members of the staff looked the other way, despite the obvious signs of sex trafficking associated with Jane Doe's trafficking at Motel 6. This would not have occurred if Defendants had

implemented and enforced adequate anti-sex trafficking policies and training. Defendants actively contributed to Jane Doe's ongoing trafficking through acts and omissions that facilitated the work of her traffickers, including, but not limited to, adopting policies and procedures that allowed trafficking to flourish in Motel 6 properties and failing to implement and enforce adequate anti-sex trafficking policies and training despite their actual knowledge they were profiting off sexual exploitation.

91. Defendants are responsible for the acts and omissions of the staff of the Motel 6 Savannah because these acts were committed in the scope and course of employment for Defendants.

92. Defendants are responsible for the acts and omissions of the Motel 6 Savannah staff because Defendants failed to exercise reasonable care regarding the hiring, training, and supervision of these employees, particularly given the risks, known to Defendants, of human trafficking occurring at Motel 6 Savannah.

93. Defendants, through their agents and employees, had an opportunity to and did observe obvious signs of sex trafficking at the Motel 6 Savannah and yet allowed it to continue unabated and facilitated and supported it.

94. Franchisee knew or was willfully blind to the fact that Jane Doe (K.B.)

was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to harbor and maintain Jane Doe (K.B.) and to facilitate her sexual exploitation.

95. Defendants facilitated sex trafficking of Jane Doe through their failure to adopt, implement, and enforce reasonable and adequate anti-sex trafficking policies and training despite their knowledge of the actual and ongoing problem of sex trafficking at hotel properties, including Motel 6 Savannah.

96. The most effective weapon against sexual exploitation and human trafficking is education and training.[96] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property. [97]

97. This same conclusion is echoed by others who seek to eliminate or minimize sex trafficking in the hospitality industry, including the American Hotel

[96] https://polarisproject.org/recognizing-human-trafficking/

[97] https://www.ecpatusa.org/hotel-training. ECPAT reports that, of hotel employees who receive training on sex trafficking, 84% have increased awareness of these events compared with 16% of untrained employees. See https://www.ecpatusa.org/novacancy. See also Sex Trafficking in the Tourism Industry, J. Tourism Hospit. 2015, link at https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf

Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.98 In reference to companies like G6 Hospitality ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

98. If G6 Hospitality had adequately trained and implemented guidelines, "red flags," training policies and procedures, and other recommendations adopted in the industry, G6 Hospitality would have known of Jane Doe's trafficking at Motel 6 Savannah and would have been in a position to prevent the trafficking of Jane Doe (K.B.).

99. Despite the obvious signs of sex trafficking at the Motel 6 Savannah, Jane Doe (K.B.)'s trafficker was allowed to continue to use Motel 6 Savannah as the venue for Jane Doe's violent sexual exploitation and trafficking. Adequate training would have prevented Jane Doe's trafficking.

100. There was heavy foot traffic in and out of Jane Doe K.B.'s room involving men who were not hotel guests. Jane Doe had approximately four (4) to ten (10) men a day sexually exploiting her at Motel 6 Savannah. These individuals

---

[98] https://www.ahla.com/issues/human-trafficking

entered and left at unusual hours and were present at the hotel for brief periods of time, which are sign of sex trafficking. Had Defendant G6 Hospitality enforced the policies and procedures they enacted to prevent trafficking from occurring within their G6 hotels after observing an obvious sign of trafficking as described above, Jane Doe's trafficking would have been identified and reported, which would have prevented her trafficking at Motel 6.

**D. G6 Hospitality Had Actual or Constructive Knowledge of the Sex Trafficking at the Motel 6 Savannah, Including Jane Doe (K.B.)'s Trafficking.**

101. Based upon public reporting, investigations, criminal incidents, hotel reviews and comments, G6 Hospitality had actual knowledge of pervasive and continuous sex trafficking throughout the Hotel Industry, its franchised and owned hotel properties (including Motel 6 Savannah), and knowingly chose to facilitate sex trafficking at its locations, including Motel 6 Savannah, and benefited from its participation in a sex trafficking venture. G6 Hospitality's knowledge went well beyond its general awareness of sex trafficking in the hospitality industry; it had actual knowledge of the sex trafficking venture carried on at Motel 6 Savannah.

102. Upon information and belief, the G6 Hospitality knew or should have known about the widespread trafficking at the Motel 6 Savannah, including the

trafficking of Jane Doe (K.B.) based on:

a. The obligation of hotel staff and Franchisee to report suspected criminal activity, including sex trafficking, to G6 Hospitality;

b. G6 Hospitality's regular monitoring of online reviews;

c. G6 Hospitality's collection and monitoring of customer surveys and complaints;

d. G6 Hospitality's requirement that Franchisee submit regular and detailed reports to G6 Hospitality about day-to-day hotel operations;

e. G6 Hospitality's collection and monitoring of data about guests at the Motel 6 Savannah, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f. G6 Hospitality's supervision and control over day-to-day operations of Motel 6 Savannah through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee to use and through which Franchisee were obligated to allow the G6 Hospitality to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g. G6 Hospitality's regular inspections of the hotel property;

h. G6 Hospitality's employment of field agents to work with hotels on security issues, including trafficking issues;

i. G6 Hospitality's access to surveillance and security systems;

j. Information provided to G6 Hospitality's by law enforcement and its own review of police incident reports; and

k. Other sources of information uniquely available to G6 Hospitality.

103. Upon information and belief, under G6 Hospitality's protocol, which on its face required hotel staff and Franchisee to report suspected criminal activity to the G6 Defendants, hotel staff and Franchisee were required to report numerous instances of suspected sex trafficking to G6 Hospitality prior to Jane Doe (K.B.'s)'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the Motel 6 Savannah.

104. Under G6 Hospitality's reporting protocol, the "red flags" of Jane Doe (K.B.)'s trafficking observed by hotel staff were sufficiently numerous and obvious that there was a clear obligation to make a report to G6 Hospitality. G6 Hospitality intentionally does not disclose how much information is made available to it about suspected sex trafficking incidents at its properties, such that its knowledge about a particular incident of suspected sex trafficking is information within G6 Hospitality's exclusive control.

105. Motel 6 Savannah staff, the "boots on the ground," observed the signs of Jane Doe's trafficking at Motel 6 Savannah. These employees were purportedly required to relay their knowledge of Jane Doe (K.B.)'s sex trafficking to G6 Hospitality. Thus, all Defendants knew or should have known about Jane Doe

(K.B.)'s sex trafficking.

106. Upon information and belief, during the 16-week period that K.B. was trafficked at the Motel 6 Savannah, G6 Hospitality had real-time access to guest and property data that reflected the red flags of sex trafficking at the Motel 6 Savannah, including K.B.'s trafficking on site, such as repeated payment with cash, refusal of housekeeping services, documented staff concerns and guest complaints, and other red flags.

107. Upon information and belief, during the 16-week period that K.B. was trafficked at the Motel 6 Savannah, G6 Hospitality's close supervision of the property and access to extensive data related to the property gave G6 Hospitality actual or constructive notice of widespread trafficking, including Jane Doe (K.B.)'s trafficking.

108. Moreover, the knowledge of the Motel 6 Savannah staff, including its management-level employees, is imputed to Defendants as corporate knowledge and therefore, all Defendants knew or should have known that Jane Doe (K.B.) was being trafficked in the Motel 6 Savannah.

109. G6 Hospitality knew or should have known that their reservation, check-in, housekeeping and security policies and practices were facilitating

widespread sex trafficking at the Motel 6 Savannah, including the trafficking of Jane Doe (K.B.), including by allowing traffickers to operate with minimal traceability. Alternatively, if G6 Hospitality had exercised ordinary diligence, it would have known it was benefiting from the sex trafficking at the Motel 6 Savannah, including the trafficking of Jane Doe (K.B.). Thus, constructive knowledge of the trafficking of Jane Doe (K.B.) is imputed to G6 Hospitality.

110. If Defendants had used ordinary prudence, they would have been aware of the widespread and ongoing trafficking at the Motel 6 Savannah, including the trafficking of Jane Doe (K.B.), and that they were financially benefiting from such trafficking.

**E. G6 Hospitality Facilitated Trafficking, Including the Trafficking of Jane Doe (K.B.).**

111. G6 Hospitality retained control over the details and methods of aspects of the operation of the Motel 6 Savannah that are directly relevant to the proliferation of sex trafficking at that property. As a result of this retained control and its direct involvement, G6 Hospitality participated in a venture with sex traffickers who were using the G6 Hospitality as a venue for their trafficking.

112. Upon information and belief, G6 Hospitality participated directly in aspects of the operation of the Motel 6 Savannah that influenced whether and to what

extent trafficking occurred at the hotel, including but not limited to the trafficking of Jane Doe (K.B.), as follows:

a. G6 Hospitality has publicly assumed responsibility and control over the human trafficking response of all Motel 6 and Studio 6 properties, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy.

b. G6 Hospitality retained control over when its hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in G6 hotels.

c. G6 Hospitality retained control over the response to trafficking by creating a reporting hotline for hotel staff and Franchisee to report suspected human trafficking to G6 Hospitality. G6 Hospitality determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement.

d. G6 Hospitality retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity.

e. G6 Hospitality expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking.

f. G6 Hospitality retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. G6 Hospitality determined whether the training is provided, when was provided, the content of the training, how the training was delivered, who received the training, and the consequences if someone did not participate in the training or failed to follow such training.

g. Although they delayed making any reasonable effort to do so, G6 Hospitality acknowledges that it retains control to adopt requirements

for franchised hotels specifically designed to prevent human trafficking and other criminal activity.

h. G6 Hospitality maintains a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Motel 6 and Studio 6 properties, including suspected trafficking incidents.

i. G6 Hospitality is responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking.

j. G6 Hospitality maintained control over all details of the terms under which franchised hotels, including the Motel 6 Savannah, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. G6 Hospitality dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the subject Motel and Studio 6s.

k. G6 Hospitality retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Motel 6 Savannah, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

l. G6 Hospitality collected, maintained, and analyzed detailed data regarding housekeeping services at the Motel 6 Savannah, including trends that would reveal patterns consistent with human trafficking.

113. G6 Hospitality directly participated in and retained day-to-day control over renting rooms at the Motel 6 Savannah by, among other things:

a. G6 Hospitality controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific

policies governing the means and methods used for each of these processes.

b. G6 Hospitality directly made reservations for rooms at the Motel 6 Savannah and accepted payment for those rooms through a central reservation system that they controlled and operated. G6 Hospitality could reserve rooms and accept payments without requiring franchisee approval or involvement.

c. G6 Hospitality established and maintained control over a brand-wide "do not rent" system. G6 Hospitality set all policies related to use of this system and dictated the day-to-day details of reservations at the Motel 6 Savannah through detailed policies that it established regarding use of this "do not rent" system.

d. G6 Hospitality controlled room rates, required discounts, mandatory fees, and rewards programs.

e. G6 Hospitality controlled and restricted the ability of Franchisee and staff to refuse or cancel a reservation.

f. G6 Hospitality controlled and oversaw policies and procedures regarding check-in, payment and identity verification procedures.

g. G6 Hospitality collected, retained, monitored, and analyzed detailed data about every guest who stayed at the subject Motel and Studio 6s.

h. G6 Hospitality established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the subject Motel and Studio 6s until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

i. G6 Hospitality required Franchisee to use G6's property management system, which was owned, maintained, controlled, and operated by the

G6 Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

114. G6 Hospitality had a direct business relationship with traffickers operating at the Motel 6 Savannah because, among other things, G6 Hospitality directly rented rooms at the hotel, directly received payment, and received real-time guest information through its ownership and control of the required reservation system. Traffickers further developed a business relationship with G6 Hospitality by developing brand loyalty and intentionally choosing G6 branded hotels because it was known they created a favorable environment for trafficking.

115. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Motel 6 Savannah, G6 continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (K.B.).

116. Jane Doe (K.B.)'s trafficking resulted directly from the acts and omissions of G6 Hospitality that facilitated widespread trafficking at the Motel 6 Savannah.

117. G6 Hospitality knew or should have known that Jane Doe (K.B.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe

(K.B.)'s sexual exploitation.

118. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Motel 6 Savannah, G6 Hospitality continued participating in a venture at that hotel, with Franchisee and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotel, including but not limited to by the following:

a. G6 Hospitality adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining Franchisee and hotel staff regarding issues related to human trafficking.

b. G6 Hospitality provided inadequate training on issues related to human trafficking and unreasonably delayed providing training.

c. G6 Hospitality adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Motel 6 properties.

d. G6 Hospitality implicitly approved decisions by Franchisee and hotel staff not to respond to criminal activity including sex trafficking appropriately.

e. G6 Hospitality continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Motel 6 Savannah.

f. G6 Hospitality attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal.

g. Despite having specific knowledge of policies that would significantly reduce sex trafficking at its hotel locations including the Motel 6 Savannah, G6 Hospitality declined to implement policies that would

likely have the effect of reducing its sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at its properties.

h. G6 Hospitality willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner.

i. G6 Hospitality allowed traffickers to reserve rooms using cash, and, to do so day after day, which provided relative anonymity and non-traceability.

j. G6 Hospitality provided traffickers with access to internet services in a manner that G6 Hospitality knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

119. G6 Hospitality should have known about Jane Doe (K.B.)'s trafficking because it retained control over the training of the staff of Motel 6 Savannah regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel facilities for sexual exploitation and human trafficking. If G6 Hospitality had exercised reasonable diligence in providing training, G6 Hospitality would have known about the obvious and apparent sex trafficking, including the trafficking of Jane Doe K.B, at the Savannah Motel 6. Thus, under §1595(a) knowledge of that trafficking is imputed to G6 Hospitality.

120. G6 Hospitality should have known about Jane Doe (K.B.)'s trafficking because it also retained control over the response of G6 hotels to human trafficking,

including development of policies and procedure regarding detection, disruption of and response to human trafficking. By failing to exercise reasonable diligence in discharge of this duty, G6 Hospitality facilitated sex trafficking, including the sex trafficking of Jane Doe (K.B.) in their hotel. Thus, under §1595(a) knowledge of that trafficking is imputed to G6 Hospitality.

121. G6 Hospitality also should have known about Jane Doe (K.B.)'s trafficking because G6 Hospitality retained the control to adopt and enforce policies on this subject for its properties, including Motel 6 Savannah, but failed to adopt and adequately enforce appropriate check-in, payment, and identification policies, which facilitated trafficking at the Motel 6 Savannah and allowed traffickers to access rooms for the purpose of harboring their victims, including Jane Doe (K.B.). Thus, under §1595(a) of the TVPRA constructive knowledge of that trafficking is imputed to G6 Hospitality.

122. G6 Hospitality also should have known about Jane Doe (K.B.)'s trafficking because it retained control over the security of the Motel 6 Savannah through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing and responding to customer complaints, and inspecting the Motel 6 Savannah. They also collected data regarding

hotel operations and customers, including names, payment information, payment method, reservation history, wi-fi browsing data, and other details associated with their stay. If G6 Hospitality had used reasonable prudence in monitoring and reviewing this information, it would have known about the ongoing trafficking. Thus, under §1595(a) constructive knowledge of that trafficking is imputed to G6 Hospitality.

123. Jane Doe (K.B.) exhibited the kind of obvious signs of sex trafficking that would have been detectable and detected if G6 Hospitality had used reasonable diligence in the aspects of hotel operations over which it retained control.

124. Moreover, K.B.'s trafficker was able to operate without interference and without making significant effort at a concealment for a four-month period because G6 Hospitality adopted policies and practices that insulated K.B.'s trafficker from significant risk of detection or disruption.

## F. Franchisee acted as the actual agent of G6 Hospitality.

125. G6 Hospitality subjected Franchisee to detailed standards and requirements regarding the operation of the Motel 6 Savannah through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, de fact practices, and

expectations imposed by G6 Hospitality.

126. Upon information and belief, G6 Hospitality also subjected Franchisee to control by requiring Franchisee to permit G6 Hospitality's direct involvement in areas of hotel operations, including aspects of internal hotel operations, such as human resources, accounting, and information technology.

127. G6 Hospitality obscures the full extent of control they exercise over the Franchisee by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, G6 Hospitality:

a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee used at the Motel 6 Savannah, such as providing hotel staff with step-by-step on how to perform tasks at the hotel and mandating that Franchisee use computer systems and software selected and controlled by G6 Hospitality;

b. participated in virtually all aspects of hotel operations, including internal operating functions, such as human-resources issues and accounting and finance practices;

c. dictated the specific manner in which Franchisee and hotel staff must carry out most day-to-day functions at the Motel 6 Savannah; and

d. significantly exceeded what was necessary for G6 Hospitality to protect its registered trademarks.

128. In addition to the ways described above, upon information and belief,

G6 Hospitality exercised and reserved the right to exercise systemic and pervasive control over Franchisee's day-to-day operation of the Motel 6 Savannah, including the following ways:

a. G6 Hospitality required Franchisee and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the G6 Hospitality to protect their registered trademarks.

b. G6 Hospitality provided training for hotel management and select hotel staff on-site at the Motel 6 Savannah and at locations selected by G6 Hospitality.

c. G6 Hospitality required all hotel staff to participate in training it created through an online learning platform it controlled and maintained.

d. G6 Hospitality controlled training provided by Franchisee to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used and when and how often such training was conducted.

e. G6 Hospitality retained sole discretion to determine whether all training had been completed satisfactorily.

f. For certain products and services that Franchisee were required to purchase to operate the Motel 6 Savannah, G6 Hospitality designated approved vendors and prohibited Franchisee from purchasing goods and services from anyone other than an approved vendor.

g. G6 Hospitality required Franchisee to sign a technology agreement governing the terms under which Franchisee must procure and use technical services and software while operating the Motel 6 Savannah. Franchisee were required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel.

h. G6 Hospitality set required staffing levels for the Motel 6 Savannah.

i. G6 Hospitality established detailed job descriptions for all positions at the Motel 6 Savannah and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so.

j. G6 Hospitality set requirements for the hiring process used by Franchisee and oversaw employee discipline processes and termination decisions.

k. G6 Hospitality provided benefits for employees of franchised hotels.

l. G6 Hospitality required Franchisee to use a customer resource management program maintained and operated by G6 Hospitality

m. G6 Hospitality controlled channels for guests to report complaints or provide feedback regarding the Motel 6 Savannah and directly participated in the response and/or supervised and the response to customer complaints or other feedback. G6 Hospitality retained the right to provide refunds or other compensation to guests and to require Franchisee to pay associated costs.

n. G6 Hospitality generated reports and analysis of guest complaints and online reviews for the Motel 6 Savannah.

o. G6 Hospitality required Franchisee to use a Guest Relations Application owned, operated, and maintained by G6 Hospitality to manage all guest data and information. G6 Hospitality could use the backend of this system to analyze data and generate reports.

p. G6 Hospitality set detailed requirements for insurance that Franchisee must purchase and retained the right to purchase insurance for Franchisee and to bill Franchisee directly for that insurance if G6 Hospitality determined that the Franchisee has not purchased adequate insurance.

q. G6 Hospitality regularly audited the books and records of Franchisee.

r. G6 Hospitality conducted frequent and unscheduled inspections of Motel 6 and Studio 6 properties, including the Motel 6 Savannah.

s. G6 Hospitality retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if Franchisee violated any of the G6 Hospitality's detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Motel 6 Savannah.

t. G6 Hospitality controlled all marketing for Motel 6 Savannah and prohibited Franchisee from maintaining any online presence unless specifically reviewed and approved by G6 Hospitality.

u. G6 Hospitality imposed detailed recordkeeping and reporting requirements on Franchisee regarding virtually all aspects of hotel operations.

v. G6 Hospitality supervised and controlled day-to-day operations of the Motel 6 Savannah through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee to use.

w. G6 Hospitality retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

129. Franchisee was and is at all material times required to comply with franchise agreement standards, policies, and rules, including those related to security, kidnapping, the trafficking of persons and/or compelled prostitution, if any, promulgated by G6 Hospitality.

130. Franchisee was an actual agent of G6 Hospitality with respect to the operation of the Motel 6 Savannah.

131. G6 Hospitality is also vicariously liable because it retained and exercised control over the specific instrumentalities and aspects of operations that caused K.B.s' harm, including but not limited to reservations of rooms, hotel security, and detection of and response to suspected sex trafficking. G6 Hospitality had the right to exercise detailed, day-to-day control over and involvement in these areas. It also regularly and closely monitored these areas.

**G. Defendants Knowingly Benefitted from Jane Doe's Sex Trafficking**

132. Defendants knowingly received substantial financial benefit from Jane Doe's traffickers, including but not limited to revenue generated from room rental and other ancillary expenses at the Motel 6 Savannah. Thus, Defendants benefited directly from providing support to Jane Doe's traffickers, who Defendants knew or should have known were engaged in illegal sex trafficking.

133. Franchisee intentionally or knowingly benefited through increased revenue from rooms rented to Jane Doe K.B.'s traffickers. G6 Hospitality intentionally or knowingly benefited from participating in a venture that traffics another person by, among other things, receiving financial benefits from the trafficking venture at their corporate headquarters in Carrolton, Texas. For every room rented, a percentage is sent by G6's operating company (for G6 owned properties) or the franchisee (for franchised properties) to Defendants at their corporate headquarters in Carrollton, Texas.

134. G6 Hospitality's revenue increased every time a room was rented to a trafficker, including K.B.'s trafficker, and G6 Hospitality knew that each room rental at the Motel 6 Savannah increased its revenue.

135. By participating in a venture that facilitated sex trafficking, Defendants also benefitted by keeping operating costs low, maintaining the loyalty of the

segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the Motel 6 Savannah specifically.

136. In ways described more fully above, G6 Hospitality and Franchisee knowingly received a financial benefit from participating in a venture, in the form of a continuous business relationship and implicit understanding, to rent rooms to sex traffickers which were used for exploitation and harboring of sex trafficking victims (hereinafter "Venture 1").

137. G6 Hospitality and Franchisee formed this continuous business relationship with the traffickers at the Motel 6 Savannah by continuing to rent rooms to traffickers (including Jane Doe (K.B.)'s traffickers) long after G6 Hospitality and Franchisee knew or should have known that the rooms were being used for unlawful trafficking.

138. This implicit understanding developed because sex traffickers, including Jane Doe (K.B.)'s sex traffickers, frequently used the Motel 6 Savannah for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of G6 Hospitality and Franchisee that created a favorable environment for sex trafficking to flourish.

139. Both G6 Hospitality and Franchisee participated in this venture by acting jointly to rent rooms to traffickers. Franchisee provided "boots on the ground" for reservations, and G6 Hospitality directly participated in renting rooms, retained control over reservation systems, and developed and enforced applicable policies and guidelines as further described in this Complaint. Each Defendant participated in the venture by continuing to rent rooms to Jane Doe (K.B.)'s traffickers long after they knew or should have known that victims like Jane Doe (K.B.) were being subjected to unlawful trafficking.

140. Defendants did not only provide these traffickers with a physical space (harboring) but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

a. Jane Doe (K.B.)'s traffickers were familiar to the staff at the Motel 6 Savannah;
b. Jane Doe (K.B.)'s traffickers took no steps to conceal their activities from the staff at the Motel 6 Savannah but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by that staff;
c. Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

d. Defendants provided additional services to traffickers (including Jane Doe (K.B.)'s traffickers), including but not limited to, internet access, excessive towels and linens, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

141. The criminal traffickers operating at the Motel 6 Savannah as part of Venture 1 violated 18 U.S.C. §1591 as to victims including Jane Doe (K.B.)

142. Jane Doe (K.B.)'s trafficking at the Motel 6 Savannah West was a result of each Defendant's participation in Venture 1 with the criminal traffickers. If Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (K.B.)'s trafficking at the Motel 6 Savannah West.

143. In ways described more fully above, G6 Hospitality also knowingly received a financial benefit from participating in a commercial venture with Franchisee operating the Motel 6 Savannah (hereinafter "Venture 2").

144. G6 Hospitality and Franchisee had a longstanding business relationship pursuant to which they jointly participated in operation of the Motel 6 Savannah with a shared goal of maximizing revenue, including gross room revenue.

145. Venture 2 violated the TVRPA through the widespread sex trafficking at the Motel 6 Savannah, including Jane Doe (K.B.), and through the conduct of Franchisee who violated the TVPRA as a perpetrator by harboring sex trafficking

victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2). The trafficking facilitated by Venture 2 involved multiple traffickers and multiple victims. This facilitation was ongoing and persisted long after each Defendant knew or should have known about the trafficking.[99]

146. Despite its actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), G6 Hospitality participated in the venture by continuing to operate the Motel 6 Savannah with Franchisee in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of Jane Doe (K.B.). G6 Hospitality continued providing Franchisee with operational support, use of its trademarks, marketing services, and other resources to operate the Motel 6 Savannah in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).[100]

---

[99] *See supra* paragraph 94-95.

[100] *See supra* paragraph 114-131.

147. G6 Hospitality knew its policies and practices were causing widespread sex trafficking at its hotels, including the Motel 6 Savannah and, nonetheless, continued operating in a way that it knew would result in further benefit from sex trafficking at its properties.

148. As a result of the monies paid by Jane Doe (K.B.)'s traffickers to the secure rooms for her trafficking at Motel 6 Savannah, all Defendants knowingly benefitted from participating in the venture that they knew or should have known trafficked, harbored, and maintained Jane Doe's trafficking at Motel 6 Savannah.

## A. CAUSE OF ACTION AGAINST HOTEL DEFENDANTS

### VIOLATION OF THE TVPRA, 18 U.S.C. §1595 (AGAINST ALL DEFENDANTS)

149. Jane Doe adopts and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as fully set forth herein.

150. Jane Doe is a victim within the meaning of 18 U.S.C. 1595(a). Jane Doe has suffered substantial physical and psychological injuries and other damages as a result of being trafficked at the Motel 6 Savannah.

151. Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as described above, each Defendant knowingly benefitted, by

receiving financial and other compensation, for their participation in a venture they knew or should have known was engaged in sex trafficking, in violation of the TVPRA, 18 U.S.C. § 1591, et seq. Defendants knew that their repeated failures to address known risks of human trafficking at their hotel properties, and to continue providing venues for sex trafficking, would increase the overall volume of illegal commercial sexual exploitation and victimization at their hotel properties. Defendants further knew or should have known that their acts and omissions were advancing the trafficker's sale and victimization of Jane Doe for commercial exploitation at Motel 6 Savannah.

152. Each and every one of Defendants knowingly received the following benefits as the result of a participating in a venture that Defendants knew or should have known was engaged in sex trafficking:

a. Profit from renting rooms to those looking to sexually exploit Jane Doe (K.B.) and other human trafficking victims;

b. Increased profit margins due to lower operation cost by refusing to implement proper training of the Hotel Defendants' employees and managers regarding the signs of human trafficking and the exploitation of victims;

c. Increased profit margins due to lower operation cost by refusing to hire qualified security officers who would actively combat human trafficking and the exploitation of victims;

d. Increased profit margins as a result of continued customer loyalty by traffickers and johns who sought to exploit victims, including Jane Doe (K.B.), due to Hotel Defendants' lack of measures against the exploitation of victims and human trafficking. This customer loyalty led to continued alcohol, food, and room sales;

e. Increased profit margins as a result of presenting a more "marketable brand" to traffickers and johns looking to exploit victims–which in turn leads to higher alcohol, food, and room sales when these traffickers and johns visit Hotel Defendants' property; and

f. Increased profit margins by knowingly catering to the needs of a criminal sub-culture that is looking for locations that will not actively enforce laws against human trafficking and the exploitation of victims or take active security measures to prevent human trafficking and the exploitation of victims on their property.

g. Other direct and indirect benefits of both a financial and non-financial nature to be proven at trial.

153. Each and every Defendant participated in a venture with, among others, Jane Doe's traffickers. Defendants had an association in fact with Jane Doe's traffickers. Despite the fact that Defendants knew or should have known that he was engaged in sex trafficking in violation of the TVPRA, Jane Doe's trafficker was able to continue renting rooms for the exploitation of Jane Doe. Traffickers, including the trafficker of Jane Doe, frequently used the Motel 6 Savannah because they knew that staff members looked the other way despite obvious signs of trafficking and that Defendants failed to adopt and implement policies to detect and stop trafficking.

Thus, there was an implicit agreement between the traffickers and Defendants and their employees and agents, including the staff of the Motel 6 Savannah. Each of the venturers shared a common purpose – the rental of hotel rooms and the making of profits. Each Defendant profited while Jane Doe's trafficker was able to rent a secure venue to earn profits by trafficking Jane Doe. Each Defendant took affirmative actions in furtherance of the venture by continually renting rooms to sex traffickers including but not limited to Jane Doe's trafficker, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of Jane Doe's trafficking.

154. Despite the fact that they knew or should have known about the atrocities occurring on their properties, Defendants kept receiving benefits from the rental of rooms to traffickers. As a result of Defendants' choice to receive such benefits, many victims, including Jane Doe, were trafficked and exploited on the properties of the Defendants. This provided a venue for trafficking and constitutes participation by Defendants in a venture under the TVPRA.

155. **Venture 1:** Through acts and omissions more fully described throughout this First Amended Complaint, each Defendant received a financial

benefit from participating in Venture 1 with sex traffickers, including Jane Doe (K.B.)'s traffickers. Each Defendant violated the TVPRA through its participation, as a beneficiary, in Venture 1 as follows:

a. Venture 1 resulted when Defendants developed and maintained a continuous business relationship and implicit understanding with sex traffickers at the Motel 6 Savannah by renting them hotel rooms and providing them related services despite the fact that each Defendant knew or should have known these traffickers were using the Motel 6 Savannah to engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2), including the trafficking of Jane Doe (K.B.)

b. This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including Jane Doe (K.B.), in the rooms of the Motel 6 Savannah.

c. Each Defendant knew or should have known Venture 1 engaged in violations of the TVPRA.

d. Each member of Venture 1 pursued the purpose of generating revenue through this continuous business relationship. Traffickers (including Jane Doe (K.B.)'s trafficker) rented rooms to earn profits by exploiting trafficking victims (including Jane Doe (K.B.)). Each Defendant received a financial benefit every time a trafficker rented a room.

e. Each Defendant participated in the venture by continually renting rooms to traffickers, creating a favorable environment for trafficking, and providing a venture where traffickers could continue to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of trafficking (including Jane Doe (K.B.)'s trafficking).

156. **Venture 2**: Through acts and omissions more fully described throughout this First Amended Complaint, G6 Hospitality received a financial benefit from participating in Venture 2 with Franchisee operating the Motel 6

Savannah. G6 Hospitality violated the TVPRA through participation, as a beneficiary, in Venture 2 as follows:

a. Venture 2 is a commercial venture that resulted from the business relationship between G6 Hospitality and Franchisee to operate the Motel 6 Savannah with a common objective of maximizing revenue at the hotel, including gross room revenue.

b. The venture violated the TVPRA through the widespread sex trafficking that occurred at the Motel 6 Savannah, including the trafficking of Jane Doe (K.B.) This venture also violated the TVPRA through the conduct of Franchisee, who violated 18 U.S.C §1591(a) as perpetrators.

c. G6 Hospitality knew or should have known Venture 2 was engaged in violations of the TVPRA.

d. G6 Hospitality knowingly benefited from this venture through the management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of the Motel 6 Savannah, which increased every time a room was rented including rooms rented to traffickers.

e. G6 Hospitality knew its policies and practices were causing widespread sex trafficking at its hotels, including the Motel 6 Savannah and, nonetheless, continued operating in a way that it knew would result in further benefit from sex trafficking at its properties, including the Motel 6 Savannah.

f. G6 Hospitality participated in this venture by (1) continuing the ongoing business relationship with Franchisee despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel; and (3) continuing to lend the perceived legitimacy of the Motel 6 brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

157. The ventures in which each Defendant participated were a direct, producing, and proximate cause of the injuries and damages to Jane Doe (K.B.).

158. Defendants committed each of these violations directly, through their own acts and omissions, and through the acts and omissions of their agents and subagents, including the staff of the Motel 6 Savannah.

159. G6 Hospitality is vicariously liable for the acts, omissions, and knowledge of Franchisee and the hotel staff while operating the Motel 6 Savannah.

160. Through the acts and omissions described throughout this First Amended Complaint, G6 Hospitality exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee and hotel staff to operate the Motel 6 Savannah.

161. Franchisee and hotel staff acted as actual agents of G6 Hospitality when operating the Motel 6 Savannah.

162. K.B.'s exploitation at the Motel 6 Savannah resulted directly from areas over which G6 Hospitality retained and exercised control. This makes Hare Krishna the actual agent of G6 Hospitality as to these areas of retained control and makes G6 Hospitality vicariously liable for the same.

163. Defendants are jointly and severally liable for the entire amount of damages awarded by a jury in this case under TVPRA.

**TOLLING OF LIMITATIONS**

164. To the extent Defendants assert an affirmative defense of limitations, Plaintiff alleges that limitations was tolled due to fraudulent concealment. As set out above, Defendants made affirmative misrepresentations regarding its alleged efforts to combat human trafficking when in fact they knew these representations were false and knowingly allowed trafficking to occur on their properties and knowingly benefited from the trafficking. Defendants acted with a fixed purpose to conceal the facts necessary for the Plaintiff to know she had a cause of action against them, and Plaintiff did not discover and was not in a position to discover the existence of a cause of action against Defendants until shortly before suit was filed, and certainly not more than ten years before suit was filed.

165. To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the discovery rule. At the time Plaintiff was harmed, Plaintiff did not know that she was the victim of human trafficking, that her injury arose from being trafficked at Defendant(s) hotels or that she was a person trafficked as the term is used in the TVPRA, much less that she was being victimized by a human

trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, and certainly not more than ten years before suit was filed. Moreover, at the time the trafficking occurred, Plaintiff did not know what "human trafficking" as the term is used in the TVPRA was, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the existence of a cause of action until shortly before suit was filed, and certainly not more than five years before suit was filed.

166. In addition, to the extent Plaintiff's claim might otherwise be barred by limitations, limitations should be tolled because Plaintiff could not have reasonably discovered the cause of action, and/or was under a legal disability as described in O.C.G.A. § 9-3-90(b) (or the analogous provision of any other potentially applicable law) within the limitations period due to psychological trauma she suffered as a result of the trafficking.

## VIII. DAMAGES

167. Plaintiff adopts and re-alleges each paragraph above as if set forth herein. Including the damages specifically alleged above, Jane Doe (K.B.) seeks the following damages from all Defendants.

168. Defendants' acts and omissions, individually and collectively, caused Jane Doe (K.B.) to sustain legal damages.

169. Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (K.B.).

170. Jane Doe (K.B.) is entitled to be compensated for personal injuries and economic damages, including:

a. Actual damages (until trial and in the future)
b. Incidental and consequential damages (until trial and in the future);
c. Mental anguish and emotional distress damages (until trial and in the future);
d. Lost earnings and lost earning capacity (until trial and in the future);
e. Necessary medical expenses (until trial and in the future);
f. Life care expenses (until trial and in the future);
g. Physical pain and suffering (until trial and in the future);
h. Physical impairment (until trial and in the future);
i. Exemplary/Punitive damages;
j. Attorneys' fees; and
k. Costs of this action.

l. Pre-judgment and all other interest recoverable.

171. Plaintiff is entitled to recover exemplary damages based on Defendants' violations of the TVPRA.

## IX. JURY DEMAND

Plaintiff hereby makes application for a jury trial and request that this cause be set on the Court's Jury Docket. In support of her application, the appropriate jury fee has been paid to the Clerk at least thirty-days (30) in advance of the trial setting.

## X. PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff prays that this case be set for trial before a jury, and that upon a final hearing of the cause, judgment be entered for Plaintiff against Defendants jointly and severally, for the actual, compensatory, and punitive damages as the evidence may show and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Plaintiff may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

PR**OVOST**☆**UMPHREY LAW FIRM, L.L.P.**
350 Pine Street, Suite 1100
P. O. Box 4905
Beaumont, Texas 77704
(409) 835-6000
(409) 813-8605 (FAX)

By: ______________________________
SEAN C. VILLERY-SAMUEL (*pro hac vice*)
Texas State Bar No. 24070802
svillery-samuel@pulf.com
JAMES E. PAYNE (*pro hac vice*)
Texas State Bar No. 00788171
jpayne@pulf.com
BRYAN BLEVINS, JR. (*pro hac vice)*
Texas State Bar No. 02487300
bblevins@pulf.com

**ANNIE McADAMS, PC**
Annie McAdams (*pro hac vice*)
2200 Post Oak Blvd.
Suite 1000 PNC Tower, 10th Floor
Houston, Texas 77056
(713) 785.6262
(866) 713-6141 (FAX)
teamamc@mcadamspc.com

**DUBOSE MILLER**
Tanya F. Miller
Georgia Bar No. 508434
75 14th Street NE, Suite 2110
Atlanta, GA 30309
(404) 720-8111
miller@dubosemiller.com
***ATTORNEYS FOR PLAINTIFF***

## CERTIFICATE OF COMPLIANCE

Counsel hereby certifies that this document has been prepared with one of the font and point selections approved by the Court pursuant to L.R. 5.1 (C) of the Northern District of Georgia, specifically, 14 point, Times New Roman font.

This 12th day of January 2024.

By:____________________________________
SEAN C. VILLERY-SAMUEL (*pro hac vice*)

## CERTIFICATE OF SERVICE

I hereby certify that, on this 12th day of January 2024, I electronically filed Plaintiff Jane Doe (K.B.)'s First Amended Complaint with the Clerk of Court using the CM/EFC system, which will send an e-mail notification of such filing to all

attorneys of record.

By: ______________________________
SEAN C. VILLERY-SAMUEL (*pro hac vice*)